IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THERESA HARDING,

        Plaintiff,

        v.

PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY and UNUM
GROUP,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 11-481

Judge Nora Barry Fischer

**MEMORANDUM OPINION**

## I.    INTRODUCTION

In this case, the parties dispute whether a long-term disability plan purchased by Plaintiff Theresa Harding ("Plaintiff" or "Harding") from Defendant Provident Life and Accident Insurance Company of America ("Provident") constitutes an ERISA[1] plan, thereby preempting Plaintiff's state law claims for breach of contract, bad faith and unfair trade practices against Provident and Defendant Unum Group ("Unum") (collectively, "Defendants").[2]  This dispute was initially presented by way of a motion to dismiss under Rule 12(b)(6) filed by Defendants. (Docket No. 5).  However, because the parties presented evidence outside the pleadings in support of their respective positions, including affidavits and documentary evidence, the Court

---

[1]    "ERISA", as used herein, refers to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*

[2]    The policy in this case was issued by Provident Life and Accident Insurance Company.  However, the Court notes that Defendants Unum and Provident have not contested that they are properly named as defendants in this suit.  To this end, the Unum Group's website reports that Unum and Provident merged in 1999 to form UnumProvident Corporation.  *See* http://www.unum.com/AboutUs/OurHistory.aspx (last visited 8/19/11). UnumProvident Corporation then changed its name to Unum Group in 2007.  (*Id.*).

entered an Order converting Defendants' motion to dismiss to a motion for summary judgment pursuant to Rule 12(d) of the Federal Rules of Civil Procedure.  (Docket No. 16).  The parties have not objected to this procedure nor have they submitted any further evidence after being notified of the Court's conversion of the motion to a motion for summary judgment.  Upon consideration of all of the parties' submissions and for the reasons outlined herein, Defendants' motion for summary judgment [5] is GRANTED.

II.     FACTUAL BACKGROUND

Unless otherwise specified, the facts of record are uncontested.  Viewed in the light most favorable to Plaintiff, they are as follows.  *See Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

 *A.     Plaintiff's Background*

Plaintiff was formerly the Controller for Secon Corporation ("Secon"), a real estate company in the Pittsburgh area. (*Harding Affidavit 4/4/11*, Docket No. 11-1 at 2); *see also* http://www.seconcorp.com (last visited 8/9/11).  Among her duties at Secon, Plaintiff prepared certain forms, including IRS Form 5500, to ensure that Secon's employee benefit plans complied with the requirements of ERISA.  (*Id.*).  To this end, Plaintiff prepared ERISA compliance documents for Secon's health insurance plan, an AFLAC plan, and a Provident short-term disability plan.  (*Harding Affidavit 6/8/11,* Docket No. 15-1 at 9).  Plaintiff declares that these plans were all part of the Secon Corporation Flexible Benefits Plan and each of these plans were offered to all employees.  (*Id.*).

 *B.     Relationship Between Insurance Agent Angiulli and Secon Corporation*

John M. Angiulli is an insurance agent with Angiulli & Associates who was authorized to sell disability policies on behalf of Provident in March of 1999. (Docket Nos. 5-7 at 2, 11 at 4).

Angiulli sold Secon its short-term disability plan as part of its Secon Corporation Flexible Benefits Plan, which Secon actively set up as an ERISA plan.  (Docket No. 15 at 3-4).  In March 1999, Angiulli gave a presentation to Secon employees about purchasing individual long-term Provident Disability Income Policies ("long-term disability policies").  (Docket Nos. 11-1 at 2, 4; 15-1 at 9, 27).   Secon employees were not required to purchase these policies and some employees declined to purchase long-term disability policies.  (*Id.*).  Luana Sevick, the present Controller at Secon, states that the employees who purchased the long-term disability policies understood that: the policies were individually owned; Secon did not manage them; each individual's premium would be sent by Secon to Provident after being deducted from their paychecks; and, they would be a granted a small discount on the premiums as a result of this payment arrangement between Provident and Secon.[3]  (*Sevick Letter May 3, 2011*, Docket Nos. 11-1 at 6, 15-1 at 13).

Plaintiff and Anguilli do not believe that the individual policies were ever made a part of an ERISA plan.  (*Angiulli Affidavit 5/4/11*, Docket Nos. 11-1 at 4, 15-1 at 27; *Harding Affidavit April 4, 2011,* Docket No. 11-1 at 2).  Neither Angiulli nor the Plaintiff, who was Controller of Secon at the time, performed any direct action (i.e. filing an IRS Form 5500) to formally make the long-term disability policies that were purchased by Secon employees part of an ERISA

---

[3]     Specifically, Sevick states the following:

> The employees understood that this was individually owned, and that they would receive a small discount based on the fact that the premium would be a direct deduction from their paycheck, and forwarded by Secon Corporation to Unum Provident.  This insurance was not part of an ERISA plan.  Neither John Angiulli nor Secon Corporation completed paperwork to make this insurance part of an ERISA plan.  Secon Corporation did not manage or pay for this Unum Provident Individual Long Term Disability plan.

(Docket Nos. 11-1 at 6, 15-1 at 13)

plan.[4]   (*Id.*).   Likewise, Secon's present Controller, Luana Sevick, asserts that the long-term disability policies were never formally made an ERISA plan by Secon.   (*Sevick Affidavit May 3, 2011*, Docket Nos. 11-1 at 7, 15-1 at 12).   However, Secon formally complied with ERISA regulations to make, establish or administer a number of employee benefit plans, thereby making these plans ERISA-compliant, including an AFLAC plan, employees' health insurance, and a UNUM short-term disability plan.[5]   (*Harding Affidavit June 8, 2011*, Docket No. 15-1 at 9).[6]

C.      *Payment Arrangement Between Secon and Provident*

It is undisputed that Secon acted as an intermediary between its employees and Provident such that the employees' premiums were deducted from their respective paychecks and paid to

---

[4]      With regard to IRS Form 5500, Harding states that, "[t]o my knowledge, there was never a form 5500 filed by Secon Corporation from 1999 through 2005 that included the disability policies as part of an ERISA plan." (Docket No. 11-1 at 2).   However, she did prepare such compliance documents for other employee benefit plans. For example, the 1999 IRS Form 5500 prepared for the Secon Corporation Flexible Benefits Plan and signed by Theresa Harding on July 31, 2000 as the plan administrator does not include the Provident Disability Income Policy. (Docket No. 15-1 at 1-5).   There is a letter attached to this form sent from the FLEX ONE Administration pertaining to Secon's AFLAC plan and addressed to Theresa Harding at Secon Corporation that states the following: "[a]ttached is the prepared 5500 and schedule F form to satisfy the Code Section 6039D tax filing obligation for your cafeteria plan.   You may be required to file additional information to satisfy any ERISA imposed obligations." (*Id*. at 6).   Plaintiff also cites to the 1999 and 2005 Form 5500 instructions to articulate that the instructions require Secon to record the Provident Disability Income Policy in its Form 5500 in order to make it part of an ERISA plan. (Docket Nos. 11 at 3, 11-1 at 8-11).

[5]      Plaintiff cites the Provident Life and Accident Insurance Company Group Short Term Disability Insurance Certificate for Policyholder Secon Corporation (Effective Date of April 1, 1999) to support the assertion that the Policy in question is not an ERISA plan because this document specifies that the Short Term Disability policy is an ERISA plan while the Plaintiff's Policy has no such specification.   (Docket No. 15 at 4; Docket No. 15-1 at 19). The document states that, "[a]s a participant in the Plan you are entitled to certain rights and protections under the Employment Retirement Income Security Act of 1974….In addition to creating rights for Plan participants, ERISA imposes duties upon persons who are responsible for the operation of the employee benefit Plan."   (Docket No. 15-1 at 19).   Plaintiff also cites a January 23, 2002 letter from Unum Provident to Secon Corporation that specifies new claims and appeals procedures for short-term disability claims filed on or after January 1, 2002 and discusses necessary steps to comply with ERISA requirements.   (Docket No. 15 at 4; Docket No. 15-1 at 22-25).   This is again presented in contrast to Plaintiff's Policy that does not explicitly indicate that it is an ERISA plan. (Docket No. 15 at 4).

[6]      Harding referenced her own observations to corroborate her assertion about the Provident Policy:

> I have been granted access to the records of Secon Corporation and have reviewed the ERISA plan documents that I completed.   The records reviewed confirm that the policy in dispute was never part of the ERISA plan established by Secon Corporation and that the short term disability policy and the AFLAC plan were part of an ERISA plan.

(*Harding Affidavit June 8, 2011*, Docket No. 15-1 at 10).

4

Provident by Secon.  (Docket Nos. 1-1 at ¶ 5; 5-2 at ¶ 7, 11-1 at 6).  For example, the record includes a premium notice sent by Provident to Secon on August 6, 1999 (due date August 26, 1999) detailing the premiums due for each employee and specifically noting Plaintiff's monthly premium ($26.23) and policy number (7160082).  (Docket No. 1-1 at 49-50).  In this correspondence, the Total Premium on the invoice for the listed Secon employee group was $248.98.  (*Id.* at 50).  On at least one occasion, Secon paid Provident three times the monthly premium amount due by the employee group as evidenced by a check from Secon to Provident for $746.94, which is exactly three times the monthly payment typically due from the Secon employee group (i.e., $248.98 x 3 = $746.94).  (*Id.* at 51-52).

D.     *Employer Discount Group Arrangement between Secon and Provident*

Employees of Secon Corporation who purchased long-term disability insurance through Provident received a twenty-percent Salary Allotment Discount.   (Docket No. 1 at ¶ 14).  The evidence is undisputed that the Secon employees would not have received the discount if they were not part of the employer discount group.  To this end, Sevick, Secon's Controller, admits that "[t]he employees understood … that they would receive a small discount *based on the fact that the premium would be a direct deduction from their paycheck, and forwarded by Secon Corporation to Unum Provident.*"  (*Sevick Letter 5/3/11*, Docket Nos. 11-1 at 6, 15-1 at 13 (emphasis added)).   Likewise, a representative of Provident, Devra J. Kotel, an I.D. Chief Underwriter, declares that "Ms. Harding received this Policy *by virtue of her employment at Secon* at a 20% premium discount, as part of a Risk Group of eligible Secon Employees."  (*Kotel Affidavit*, Docket No. 5-2 at ¶¶ 1, 4 (emphasis added)).

This risk group arrangement is also evidenced by two faxes which originated from John Angiulli's office.  (Docket Nos. 5-7 at 2).  One fax, dated September 19, 2007, requests an

5

additional registration to the Secon Corporation Risk Group and a call to confirm the registration.  (Docket No. 5-7 at 5).  Another fax, dated March 6, 2008, contains a request for a multi-life quote from Angiulli for fourteen Secon employees. (*Id.* at 2-4).  This fax is followed by an email between Unum employees, including Kotel, in which he states that he is willing to provide a fully underwritten insurance quote based on the Secon employees' income.  (*Id.*).

    E.    *Plaintiff's Policy*

After Anguilli's presentation, Plaintiff completed an application for a long-term disability policy with Provident on March 23, 1999.  (Docket No. 1-1 at 36).  Plaintiff's application contained personal information and medical history relevant to determining whether or not she was eligible for coverage.  (*Id.* at 33-35).  Plaintiff was deemed eligible for coverage and she was issued policy number 66-450GR-7160082 ("Policy"), which took effect on April 1, 1999.  (*Id.* at 14).  The terms of the Policy included up to five years of disability benefits, and also included a Residual Disability Benefit Rider which provided up to twenty-four months of coverage for residual disability benefits.  (*Id.* at ¶ 4).  Plaintiff's net monthly premium was $26.23.  (*Id.* at 14). The Maximum Benefit Period for Total Disability prior to the Policy owner's sixtieth birthday was sixty months, but the Maximum Benefit Period was scheduled to decrease yearly if the disability occurred after the Policy owner reached age sixty.  (*Id.* at 15).

Plaintiff's Policy indicates, in both the "GUIDE TO POLICY PROVISIONS" and the "POLICY SCHEDULE," that the Policy contains a "Residual Disability Benefit Rider."  (*Id.* at 13, 15).  The "POLICY SCHEDULE" also states that the Plaintiff was receiving a "Salary Allotment Discount" of $6.08 per month.  (*Id.* at 14).  With regard to this discount, the Policy notes that, "[t]his discount is applicable to the premiums for your policy only for so long as you are part of a group qualifying for the discount and for as long as the group meets the minimum

requirements for obtaining the discount." (*Id.*). In addition, the policy states that the

"MONTHLY BENEFIT FOR TOTAL DISABILITY" is $2,100. (*Id.*). Likewise, the Policy

states that the Residual Disability Benefit Rider adds an additional $1.98 to the monthly

premium and includes a maximum benefit period of twenty-four months. (*Id.* at 15).

In the Residual Disability Benefit Rider, the subject of the Rider is defined as follows:

> Residual Disability or residually disabled means that due to
>
> Injuries or Sickness
>
> 1. you are not able to do one or more of your substantial and
> material daily business duties or you are not able to do your usual
> daily business duties for as much time as it would normally take
> you to do them; and
> 2. you have a Loss of Earnings of at least 20%.

(*Id.* at 25). The text also includes the following qualifications to receive these Residual

Disability Benefits:

> We will pay Residual Disability Monthly Benefits as follows:
>
> 1. Benefits start on the day of Residual Disability following the
> Elimination Period or, if later, after the end of compensable Total
> Disability during the same period of disability.
> 2. Benefits will continue while you are residually disabled during a
> period of disability.
> 3. The period for which benefits for Residual Disability are
> payable can not [sic] exceed the Maximum Benefit Period for
> Residual Disability shown on Page 3.

(*Id.*). The Rider states that, "[t]o be considered residually disabled, you must be receiving care

by a Physician which is appropriate for the condition causing the Loss of Earnings. We will

waive this requirement when we are furnished proof, satisfactory to us, that continued care

would be of no benefit to you." (*Id.*). The Residual Disability Benefit Rider includes a formula

that is used to calculate the monthly payment for Residual Disability:

Loss of Earnings        X        Monthly Benefit for Total Disability

Prior Earnings

(*Id.*).   Furthermore, the policy includes a section called "EXPLANATION OF OPTIONAL BENEFITS," which states that "[t]he optional benefits marked (X) are applicable to your policy." (*Id.* at 40).   In this section, the Plaintiff's policy includes the requisite X marking the selection of the "Residual Disability Benefit" option. (*Id.* at 41).   The short paragraph describing the benefit states that, "[w]hen disability lasts more than one year, cost of living indexing is applied to your pre-disability earnings; as they increase, your loss becomes greater, producing increases in your Residual Disability Monthly Benefit." (*Id.*).

F.   *Plaintiff's Disability, Receipt of Disability Benefits & the Denial of Her Claim for Residual Disability Benefits*

Plaintiff became disabled on or about June 30, 2005, at which point she began to receive disability insurance benefits from Provident pursuant to her Policy.   (Docket No. 1-1 at ¶ 6). Plaintiff received the full five years of disability payments as stated by the Policy, with the last payment being for a period ending on July 30, 2010. (*Id.* at ¶ 7).   At some point before the expiration of her disability benefits, Plaintiff submitted a claim for residual disability benefits under the Policy.   (Docket No. 5-8 at 2).   Her claim was denied in a letter from Ann M. Goodrow, a Disability Benefits Specialist at Unum/Provident Life and Accident Insurance Company, on June 4, 2010. (*Id.*).   Specifically, Ms. Goodrow advised Plaintiff of the following:

Dear Ms. Harding:

Thank you for taking the time to speak with me on May 17, 2010. This letter is a follow-up to that conversation.

When you and I spoke, on May 17, 2010 about the approaching maximum benefit period for your claim, you reported that it is your understanding that you are eligible to receive another two years of benefits under your policy's rider for residual disability.   At that time we discussed the policy provisions for Total and Residual Disability and affirmed our position that no further benefits are due

8

and payable for "your period of disability" as of July 30, 2010, when the maximum benefit period is reached.  We trust this letter will assist you in understanding the contractual basis for this determination….

As you and I discussed, as of July 30, 2010, we will have provided the full 60 month Maximum Benefit Period for your "period of disability".   Although your disability continues, as of July 30, 2010, no further Disability Benefits are due, your claim will be closed, and premium billing will resume….

It is important to understand however, that we are not challenging the existence of your disability; rather, we have determined that you are no longer eligible for benefits for contractual reasons; your claim has reached the maximum benefit period for a period of disability….

If you have additional information to support your request for disability benefits, we will be happy to reconsider your claim. Please send the additional information to my attention for further review within 180 days of the date you receive this letter….

It is important to note, however, that if you choose to submit additional information for our review and later decide to appeal this claim decision, you must appeal within the 180 day period described below.

**If you do not have additional information, disagree with our determination, and want to appeal this claim decision, you must submit a written appeal.  This appeal must be received by us within 180 days of the date you receive this letter even if you submitted additional information to my attention for reconsideration.**   You should submit your written appeal to the following address:…

A decision on appeal will be made not later than 45 days after we receive your written request for review of the initial determination. If we determine that special circumstances require an extension of time for a decision on appeal, the review period may be extended by an additional 45 days (90 days in total).  We will notify you in writing if an additional 45 day extension is needed….

**If you dispute this determination, you have the right to bring a civil action under section 502(a) of the Employee Retirement Income Security Act following an adverse benefit determination on review.   Unless there are special**

**circumstances, this administrative appeal process must be**
**completed before you begin any legal action regarding your**
**claim.**

If we do not receive your written appeal within 180 days of the
date you receive this letter, our claim determination will be final.

(*Id.* at 2-6 (emphases added)).   Defendants contend that no appeal was filed and there is no

evidence in the record indicating that Plaintiff appealed the denial of her claim for residual

disability benefits.  (*See* Docket No. 5 at ¶ 30).

## III.    PROCEDURAL HISTORY

Plaintiff initiated this suit in the Court of Common Pleas of Allegheny County on March

2, 2011, alleging claims against Defendants for breach of contract, bad faith under 42 Pa.C.S. §

8371, and unfair trade practices in violation of the Pennsylvania Unfair Trade Practice and

Consumer Protection Law, 73 P.S. §§ 201-1, 201-2, 201-9.2(a).   (Docket Nos. 1 at ¶ 1, 1-1 at ¶¶

12-21, 22-35, 36-45).   Defendants removed the case to this Court on April 8, 2011, alternatively

claiming that this Court has both diversity jurisdiction and federal question jurisdiction over

Plaintiff's claims.  (Docket No. 1 at ¶¶ 3-9, 10-14).

Shortly after removal, on April 14, 2011, Defendants filed their motion to dismiss and

brief in support, attaching affidavits and other documentary evidence for the Court's

consideration.  (Docket No. 5, 6).   In response, on May 5, 2011, Plaintiff filed her reply and brief

in opposition to Defendants' motion, including affidavits and other documentary evidence of her

own. [7]   (Docket Nos. 10, 11).   Defendants submitted their reply brief on May 18, 2011.  (Docket

---

[7]        The Court notes that Plaintiff also moved to strike Defendants' brief on May 5, 2011, arguing that it was
outside the Court's page limitations; however, such motion was denied on the same date.  (*See* Docket No. 8).
Specifically, the Court entered the following text-order:

> ORDER indicating that upon consideration of Plaintiff's "Motion to Strike Brief
> in Support of the Motion to Dismiss of Defendants, Provident Life and Accident
> Insurance Company, and Unum Group" (Docket No. 8 ), wherein Plaintiff
> argues that the Court should strike Defendant's Brief because of an alleged

No. 12).  Plaintiff requested an extension of time to file a sur-reply brief, which was granted by the Court.  (Docket Nos. 13, 14).  Consistent with the Court's Order, Plaintiff filed her sur-reply brief on June 10, 2011.  (Docket No. 15).  In support, Plaintiff also supplied the Court with additional evidentiary materials.  (*Id.*).

On July 11, 2011, in light of the parties' submission of materials outside the pleadings, the Court ordered that the Defendants' Motion to Dismiss would be converted to a motion for summary judgment and disposed of on the merits pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Docket No. 16).  The Court also granted the parties leave until July 25, 2011 at 5:00 p.m. to file any further legal argument or evidentiary materials supporting or opposing summary judgment.  (*Id.*).  None came.  Therefore, Defendants' converted motion for summary judgment is now fully briefed and ripe for disposition.

## IV.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[8]  Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex Corp. v.*

---

noncompliance with section II.B. of this Court's Practices and Procedures, which states that briefs in support of motions shall not exceed 20 pages, said Motion 8 is denied. The Court notes that while Defendants' brief is 28 pages in length, the first 8 pages include only the case header and a table of authorities but the remainder of the brief contains 20 pages of argument. Accordingly, the brief is in full compliance with the Court's Practices and Procedures and there is no prejudice to Plaintiff, who has subsequently filed her response [10] and memorandum [11] in opposition to the challenged motion.

(Text Order, 5/5/11).

[8]      Rule 56 was amended effective December 1, 2010. The explanatory notes to the 2010 amendments explain that while the language in Rule 56 was changed from "issue" to "dispute," the "standard for granting summary judgment remains unchanged." Thus, the Court considers binding prior jurisprudence of the United States Supreme Court and the United States Court of Appeals for the Third Circuit in arriving at the standard to be employed in addressing the instant motion.

*Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).   A motion for summary judgment will only be denied when there is a genuine issue of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party.   *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).   The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).   As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

In determining whether the dispute is genuine, the Court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility.   Rather, the Court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party.   *McGreevy*, 413 F.3d at 363; *see also Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n.3 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994)).   In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor.   *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

V.   DISCUSSION

A.   ERISA Background

ERISA is a comprehensive federal statute enacted "in the interests of employees and their beneficiaries" to afford minimum standards to employee benefit plans, "assuring the equitable character of such plans and their financial soundness." *Page v. Bancroft Neurohealth, Inc.*, 575 F.Supp.2d 664, 670–71 (E.D.Pa. 2008) (citing 29 U.S.C. § 1001(a)). It provides for the uniform federal regulation of employee benefit plans and promotes administrative efficiency through the

exclusive federal regulation of such plans. *Keystone Chapter, Associated Builders & Contractors, Inc. v. Foley*, 37 F.3d 945, 954 (3d Cir.1994). "ERISA subjects employee benefit plans to participation, funding, and vesting requirements, and to uniform standards on matters like reporting, disclosure, and fiduciary responsibility." *Id.* (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90–91, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)).

>   B.      *Whether Plaintiff's Policy is an ERISA Plan*

The threshold issue in this case is whether Plaintiff's Policy is governed by ERISA.  The United States Court of Appeals for the Third Circuit has recognized that "ERISA applies to 'any employee benefit plan if it is established or maintained ... by any employer engaged in commerce.'" *See Deibler v. United Food and Commercial Workers' Local Union 23*, 973 F.2d 206, 209 (3d Cir. 1992) (quoting 29 U.S.C. § 1003(a) (2006)).  An "employee welfare benefit plan" or "welfare plan" is "any plan, fund, or program … established or maintained by an employer … for the purpose of providing for its participants or their beneficiaries … benefits in the event of sickness, accident, [or] disability."  29 U.S.C. § 1002(1).  "Whether a plan exists within the meaning of ERISA is 'a question of fact, to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person.'"  *Deibler*, 973 F.2d at 209-210 (quoting *Wickman v. Northwestern National Ins. Co.*, 908 F.2d 1077, 1082 (1st Cir. 1990)).

>   1.  Plaintiff's Arguments

Plaintiff sets forth two primary arguments in support of her position that the Policy is not an ERISA plan.  (Docket No. 11)  First, that she has produced evidence which shows that representatives of Secon and agent John Aguilli did not believe that the Policy was a part of an ERISA plan.  (*Id.*).  And, second, that Secon did not comply with the reporting requirements

necessary to make the Policy a part of an ERISA plan. (*Id.*). Defendants contend that this evidence is not dispositive, and argue that after considering all of the facts, a reasonable person would conclude that the Policy qualifies as an ERISA plan. (Docket No. 12). The Court will address each argument, in turn.

### a.   Subjective v. Objective Inquiry

In her first argument, Plaintiff contends that the subjective evidence she has submitted conclusively proves that the Policy is not an ERISA plan. (Docket No. 11). For support, she relies on her own affidavits and the affidavits of John Anguilli, the agent who sold her the Policy, and Luana Sevick, the present Controller at Secon. (Docket Nos. 11-1; 15-1). None of these individuals or Secon, to the extent that Sevick's declaration is made on behalf of Secon,[9] believe that the instant Policy qualifies as an ERISA plan. (*Id.*). Indeed, consistent with their statements, the Policy provides that it is an individual policy and does not mention that ERISA governs in any fashion. (*See* Docket No. 1-1). However, Plaintiff's evidence is not conclusive for two reasons consistent with the legal propositions set forth above: (1) whether the Policy is covered by ERISA is a question of law to be determined by the Court; and (2) this determination is an objective inquiry – based on consideration of all of the surrounding circumstances from the perspective of a reasonable person. *See Deibler*, 973 F.2d at 209. In sum, Plaintiff's subjective evidence does not persuade the Court that ERISA is inapplicable.

### b.   Failure to File Form 5500

Plaintiff next argues that the Policy is not governed by ERISA because Secon did not comply with certain ERISA reporting requirements; particularly that Secon did not file Form 5500 with the IRS. (Docket No. 11). However, "[c]ourts of [a]ppeals have routinely held that

---

[9]     The Court notes that in her letter dated May 3, 2011, Sevick states that "I hope this clarifies Secon Corporation's position pertaining to the UnumProvident Long Term Life Disability offering." (Docket No. 15-1 at 13).

the failure to comply precisely with ERISA's disclosure requirements does not remove an insurance plan from ERISA coverage." *Gloff v. Aetna Health, Inc.*, Civ. Action No. 2:07-cv-736, 2007 WL 2752136, at *2 (W.D. Pa. Sept. 19, 2007). In *Gloff*, the Court held that an employer's failure to file Form 5500 was not conclusive, reasoning that permitting a defendant to avoid ERISA requirements because of the failure to file a Form 5500 would violate the purpose of ERISA to protect the individual employees' interests in their employee benefit plans. *Id.* This Court finds the reasoning in *Gloff* persuasive and will follow its holding in this case.

Here, it is uncontested that Secon did not file a Form 5500 in relation to the long-term disability plans at issue. Indeed, Plaintiff was the former controller and admits that she was responsible for filing Form 5500 and other ERISA compliance documents on behalf of Secon as a part of her duties. While the failure of an employer, like Secon, to file such compliance documents may result in sanctions against the employer – including potential criminal penalties – such failure does not dictate that ERISA is inapplicable. *See Gloff*, 2007 WL 2752136, at *2 (citing 29 U.S.C. § 1131). Instead, as is discussed in further detail below, ERISA may be applicable even though Secon and Plaintiff failed to precisely conform to the disclosure requirements under ERISA.

## 2. Reasonable Person Test

Having rejected Plaintiff's initial arguments, the Court returns to its objective evaluation of the evidence, as recommended by the Court of Appeals. *See Deibler*, 973 F.2d at 209-10. To this end, "a disability insurance policy is covered by ERISA if it is obtained through: (1) a plan, fund, or program; (2) that is established or maintained; (3) by an employer; (4) for the purpose of providing benefits; (5) to its participants or beneficiaries." *Spillane v. AXA Financial, Inc.,* 648 F.Supp.2d 690, 695 (E.D.Pa. 2009). Each element will be addressed seriatim.

a.  Plan, Fund or Program

The Court of Appeals has held that "a 'plan, fund or program' under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Deibler*, 973 F.2d at 209-210 (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982)).

In this Court's estimation, after conducting the objective inquiry into the Policy and the surrounding facts, as directed by the Court of Appeals, Plaintiff's Policy qualifies as an ERISA plan, fund or program.  First, the intended benefits and procedures for receiving benefits are easily ascertainable from the Policy itself. *See Tannebaum v. Unum Life Ins. Co. of America*, 2006 WL 2671405, at * 3 (W.D.Pa. Sept. 15, 2006) ("Courts have concluded that a reasonable person can ascertain the intended benefits where, as here, the policy describes those benefits."); *see also Stone v. Disability Management Services, Inc.*, 288 F.Supp.2d 684, 689 (M.D.Pa. 2003) (quoting *Weinstein v. Paul Revere Ins. Co.*, 15 F.Supp.2d 552, 557 (D.N.J. 1998)) ("as to the procedure for receiving benefits, a reasonable person could ascertain that the employees were expected to look to the provisions of the policy … to determine the eligibility requirements to receive benefits.").  Plaintiff is the named insured on the Policy, which provides disability insurance benefits in the event of total or partial disability and residual disability benefits if she qualifies for same.  (Docket No. 1-1).  Among other things, the Policy provides that the maximum benefit for total disability under the policy was $2,100, and sets forth an equation from which the amount of residual disability benefits can be calculated.  (*Id*. at 14; 25). The Policy also sets forth the procedures for making a claim for such benefits.  (*Id*. at 30).

Second, the class of beneficiaries can be determined from the Policy and the submitted evidence.  To satisfy this requirement, a class consisting of only a single beneficiary may be sufficient.  *See Spillane*, 648 F.Supp.2d at 696 ("the requirement of a class of beneficiaries can be met even if only a single employee is covered").  In addition, courts have recognized that a group of employees who have purchased multiple individual policies from a single insurer is "'substantial evidence' that a plan, fund or program exists." *Spillane*, 648 F.Supp.2d at 696 (quoting *Stone*, 288 F.Supp.2d at 689-690).  It is undisputed that Plaintiff purchased the Policy after Secon permitted Anguilli to provide a presentation to all of its employees in an effort to sell them long-term disability policies.  (Docket Nos. 11-1 at 2; 15-1 at 9, 27).  Along with Plaintiff, at least seven (7) other employees purchased a Provident long-term disability policy around that time and the evidence shows that additional employees were added to the group at a later date. (Docket No. 5-4).  Anguilli identified these individuals as a "risk group" in correspondence with Provident and Secon.  (Docket No. 5-7 at 2).  And, the Secon employees who purchased long-term disability policies, including Plaintiff, were given a group discount for purchasing the policies together and through Anguilli. (*Sevick Letter 5/3/11*, Docket Nos. 11-1 at 6; 15-1 at 13; *Kotel Affidavit*, Docket No. 5-2 at ¶¶ 1, 4).  To this end, Plaintiff's Policy specifically states that a group discount of twenty percent (20%) was applied to lower her monthly premium payments. (Docket No. 1-1 at 14).  Given this evidence, a reasonable person would conclude that a class of beneficiaries – the Secon risk group – is present.

Third, a reasonable person can ascertain the source of funding for this plan.  Although Plaintiff maintains that she paid all of the premiums herself, she acknowledges that Secon withheld the funds for same from her paychecks.  (Docket No. 11 at 2).  Secon then paid Provident directly for the disability insurance premiums.  (Docket No. 1-1 at 51-52; Docket No.

5-2 at ¶ 7).  That said, the source of funding for an ERISA plan may consist of the employer, the employee, or a combination of both the employer and employee.  *Tannenbaum*, 2006 WL 2671405, at *4.  Accordingly, this requirement is also satisfied.

### b.  Established or Maintained by Employer

The next question for the Court is whether Secon established or maintained the plan, fund or program.  *See Spillane*, 648 F.Supp.2d at 698.  "The disjunctive nature of the 'established or maintained' language appearing in the statute suggests that a showing of either one is sufficient to give rise to ERISA's application." *Id*. (quoting *Cowart v. Metro. Life Ins. Co.*, 444 F.Supp.2d 1282, 1293 (M.D.Ga.2006)).  "Courts should focus on the employer and its involvement with the administration of the plan."  *Id*. (citing *Stone*, 288 F.Supp.2d at 690 (citing *Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 978 (5th Cir.1991))).

The evidence presented by Defendants is sufficient to demonstrate that Secon established or maintained the plan, fund or program in question.  As noted above, Secon afforded Anguilli the opportunity to meet with Secon employees and offer them an opportunity to purchase long-term disability policies from Provident.  (Docket Nos. 11-1 at 2, 7; 15-1 at 9, 27).  Plaintiff and a number of other Secon employees purchased such policies. (Def Ex. 2, Docket No. 5-2 at ¶ 5; Def Ex. "2-C", Docket No. 5-5).  Anguilli apparently was permitted to continue to actively market the policies to Secon employees as a number of Secon employees later purchased long-term disability policies and were added to the risk group.  (Def Ex. 2, Docket No. 5-2 at ¶ 8, Def Ex. "2-E").  Secon accepted monthly premium notices directly from Provident on behalf of these employees.[10]  (Def Ex. 2, Docket No. 5-2 at ¶ 5; Def Ex. "2-C", Docket No. 5-5).  The premium notices sent to Secon were in summary form, detailing the premium due from each Secon

---

[10]     The Court notes that the monthly premium notices were sent to Plaintiff's attention when she was the Controller at Secon.  (Def Ex. 2, Docket No. 5-2 at ¶ 5; Def Ex. "2-C", Docket No. 5-5).

employee.  (*Id*.).  Secon deducted the premiums due from its employees' wages (Pltf Ex. 3, Docket No. 15-1) and then paid the premiums due to Provident on behalf of its employees.  (Def Ex. 2, Docket No. 5-2 at ¶ 7, Def Exhibit "2-D", Docket No. 5-6).  Later, when individuals sought to be added to the group and obtain the twenty percent (20%) discount, Secon communicated with Provident through Aguilli in order to add these additional employees to the group.  (Def Ex. 2, Docket No. 5-2 at ¶ 8, Def Ex. "2-E").

Other courts have recognized that an employer's receipt of premium notice statements and payment of premiums on behalf of its employees demonstrates that the employer established or maintained the plan, fund or program.  *See e.g., Spillane*, 648 F.Supp.2d at 696-97; *Keenan v. Unum Provident Corp.*, 252 F.Supp.2d 163, 167 (E.D.Pa. 2003); *Stone*, 288 F.Supp.2d at 691. The evidence here is likewise sufficient, as it demonstrates that Secon actively managed the long-term disability policies for its employees; thus, the Court finds that the "established or maintained" element is satisfied.

### c.   For the Purpose of Providing Benefits

There is also sufficient evidence supporting a finding that the plan, fund or program was established or maintained "for the purpose of providing benefits." *See Spillane*, 648 F.Supp.2d at 698.  Courts have found that an employee's receipt of a volume discount from an insurer for participating in a group shows that the employer intended to provide a benefit to the employee. *Id*. at 697.  As noted above, Plaintiff was one of the Secon employees who received a volume discount from Provident, and the discount was only made available to them by virtue of their participation in the risk group.  This evidence is sufficient to demonstrate that Secon intended to provide a benefit to its employees with the long-term disability plans.

### d.   To its Participants or Beneficiaries

Finally, it is clear that Plaintiff is both a participant and a beneficiary under the instant long-term disability plan. "ERISA defines a 'participant' as an employee who is eligible to receive a benefit from an employee benefit plan." *Spillane*, 648 F.Supp.2d at 697 (citing 29 U.S.C. § 1002(7)). "A 'beneficiary' is one who is designated by the terms of an employee benefit plan, who may become entitled to a benefit thereunder." *Id*. (citing 29 U.S.C. § 1002(8)). Considering the facts of record, Plaintiff qualifies as both a participant and beneficiary, as those terms are defined, in relation to the instant long-term disability policy.

### 3.   Conclusion

In sum, after considering "all the surrounding facts and circumstances from the point of view of a reasonable person," *Deibler*, 973 F.2d at 209-210, including the facts that the Policy is an individual long-term disability policy which does not specify that it is governed by ERISA, the Court concludes that the Policy qualifies as ERISA plan, fund or program.

### C.      *ERISA Safe Harbor Provision*

However, the "Safe Harbor" regulations promulgated by the Department of Labor may exempt an insurance policy from ERISA regulation. *See* 29 C.F.R. § 2510.3-1(j) (2011). Under these regulations, an "employee welfare plan…shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which:

> (1) No contributions are made by an employer or employee organization;
>
> (2) Participation [in] the program is completely voluntary for employees or members;
>
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or

members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs."

29 C.F.R. § 2510.3-1(j) (2011). "All four factors must be met for a plan to fall within the regulation's safe harbor." *Spillane,* 648 F.Supp. 2d at 698 (quoting *Weinstein v. Paul Revere Ins. Co.*, 15 F. Supp. 2d 552, 557 (D.N.J. 1998)).

The evidence before the Court suggests that the final three Safe Harbor elements may be satisfied. *See* 29 C.F.R. § 2510.3-1(j)(2)-(4). However, Plaintiff cannot meet the first element as the undisputed evidence demonstrates that Secon made a contribution to Plaintiff, as Secon's employees who purchased policies were all given a twenty-percent (20%) discount on their premiums by virtue of their participation in a group. To this end, "[c]ourts in this Circuit have concluded that a discount on an insurance policy premium constitutes an employer contribution." *Tannenbaum,* 2006 WL 2671405, at *6. When employees are offered such a discount as a group, they receive a benefit that they could not otherwise receive as an individual. *See Brown v. The Paul Revere Life Ins. Co.*, No. Civ.A. 01-1931, 2002 WL 1019021, at *7 (E.D. Pa. May 20, 2002) ("[w]here an employer provides its employees benefits they can not [sic] receive as individuals, it has contributed to an ERISA plan."). Therefore, when discounted premiums are offered to a group of employees, the Safe Harbor regulations are not applicable and ERISA governs. 29 C.F.R. § 2510.3-1(j) (2011).

Here, the evidence of record clearly shows that Plaintiff received a discount for being a part of a risk group of Secon employees. The Policy itself shows that the Plaintiff was granted the twenty percent (20%) discount. (Docket No. 1-1 at 14). Further, representatives from Secon

and Provident acknowledge that Plaintiff received the group discount and that such discount was only available to her because she was a Secon employee and included in the risk group. (*Sevick Letter 5/3/11*, Docket Nos. 11-1 at 6; 15-1 at 13; *Kotel Affidavit*, Docket No. 5-2 at ¶¶ 1, 4). In fact, Secon's present Controller, Sevick, acknowledges that "[t]he employees understood … that they would receive a small discount *based on the fact that the premium would be a direct deduction from their paycheck, and forwarded by Secon Corporation to Unum Provident.*" (*Sevick Letter 5/3/11*, Docket Nos. 11-1 at 6; 15-1 at 13 (emphasis added)). Finally, Plaintiff has not contested that she received such a discount on her premiums, despite her submission of two affidavits and significant documentary evidence.

To conclude, Plaintiff has failed to convince this Court that the "Safe Harbor" regulations are applicable in this case. *See* 29 C.F.R. § 2510.3-1(j) (2011). Accordingly, as the exception has not been met, the Policy is governed by ERISA.

> D.    *Preemption*

Having concluded that the Policy is governed by ERISA, the next inquiry is whether Plaintiff's state law claims are preempted by the federal statutory regime. In this regard, section 514(a)—ERISA's preemption provision—promotes uniform regulation of employee benefit plans by stating that "the provisions of [ERISA] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." except for those that "regulate insurance." 29 U.S.C. § 1144(a), (b)(2)(A) (2006). The phrase "relate to" has been construed very expansively. *Linden v. Sap America, Inc.*, Civ. No. 03–3125, 2004 U.S. Dist. LEXIS 8598, at *7, 2004 WL 1047719 (E.D.Pa. May 6, 2004). "A state law relates to an ERISA plan 'if it has a connection with or reference to such a plan.'" *Egelhoff v. Egelhoff*, 532 U.S. 141, 147, 121 S.Ct. 1322, 149 L.Ed.2d 264 (quoting *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 97 (1983)).

Plaintiff has set forth three separate state law causes of action against Defendants: breach of contract, unfair trade practices and bad faith.  (Docket No. 1-1).  Defendants maintain that all three of these types of claims are preempted by ERISA.  (Docket No. 6).  Plaintiff does not specifically contest that her breach of contract and unfair trade practices claims are preempted if the Court determines that the Policy is governed by ERISA; however, she argues that ERISA does not preempt her bad faith claim.  (Docket No. 15 at 6-7).[11]

The Court agrees with Defendants.  It is well-settled that breach of contract and unfair trade practices claims under Pennsylvania law are preempted by ERISA.  *See Maldonado v. Unum Life Ins. Co. of America*, Civ. A. No. 06-2841, 2006 WL 3164799, at *2 (E.D.Pa. Oct. 31, 2006) ("Claims that relate to employee benefit plans brought pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 et. seq., are expressly preempted by ERISA."); *Jobe v. Prudential Ins. Co. of America*, 2010 WL 3811671, at *8 (W.D.Pa. Sept. 23, 2010) (same); *Linden*, 2004 U.S. Dist. LEXIS 8598, at *7, 2004 WL 1047719 (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 43, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (breach of contract claims are preempted by ERISA); *LaFata v. Raytheon Co.*, 223 F.Supp.2d 668, 676 (E.D.Pa.2002)) (same).  Likewise, in *Barber v. Unum Life Ins. Co.*, the United States Court of Appeals for the Third Circuit specifically held that state law bad faith claims under 42 Pa.C.S. § 8371 are preempted by ERISA.  *Barber v. Unum Life Ins. Co.*, 383 F.3d 134, 140-44 (3d Cir. 2004).

Despite the decision in *Barber*, upon which Defendants rely, Plaintiff argues that her bad faith claim is not preempted under two district court decisions, *Stone v. Disability Management Services, Inc.*, 288 F. Supp. 2d 684, 693-94 (M.D.Pa. 2003), and *Murdock v. Unum Provident*

---

[11]      In response to Defendants' preemption argument, Plaintiff, through her counsel, argues only that "if this Honorable Court concludes that the insurance policy in question is part of an ERISA plan, then the claims for Bad Faith under 42 P.A.C.S.A. § 8371 should remain via the ERISA Savings Clause."  (Docket No. 15 at 6-7).

*Corp.*, 265 F. Supp. 2d. 539, 540 (W.D. Pa. 2002).  *Stone* and *Murdock*, however, pre-date the Court of Appeals' decision in *Barber*.  As another District Court has recently recognized, "[P]laintiff's reliance on district court decisions decided prior to *Barber* is unavailing because those decisions are overruled to the extent they are inconsistent with *Barber*." *Jobe v. Prudential Ins. Co. of America*, Civ. A. No. 10-684, 2010 WL 3811671, at *7 (W.D.Pa. Sept. 23, 2010). Indeed, in light of *Barber*, "[P]laintiff's claim that the ERISA savings clause exempts 42 Pa.C.S. § 8371 from the preemption provisions of ERISA is not supported by law." *Id*.  Given this precedent, *see Barber*, 383 F.3d at 140-44, which the Court is bound to follow, Plaintiff's bad faith claims are preempted by ERISA.

Considering the undisputed facts of record and the aforementioned precedent, all of Plaintiff's claims are preempted by ERISA.  Therefore, the entry of summary judgment against Plaintiff and in favor of Defendants on Plaintiff's breach of contract, unfair trade practices and bad faith claims is appropriate.[12]

E.      *Failure to Exhaust Administrative Remedies*

Finally, Defendants also raise the affirmative defense of administrative exhaustion.  They assert this defense to any ERISA claims that Plaintiff could potentially bring against them, i.e., in the event that the Court would construe the claims in her Complaint as ERISA claims or, alternatively, in the event she is granted leave to amend her complaint to properly assert her claims under ERISA.  Specifically, Defendants argue that the Court should not entertain any ERISA claims advanced by Plaintiff because she failed to file an administrative appeal from the denial of benefits within the time period set forth in the denial letter.  Plaintiff has steadfastly maintained that her Policy is not governed by ERISA and thereby has taken no position on the

---

[12]      Because summary judgment is granted in favor of Defendants as to all of Plaintiff's claims, the Court need not address their alternative argument that Plaintiff's claims for punitive damages would be preempted if her claims survived.

exhaustion issue. To this end, she has submitted no evidence which demonstrates that she pursued such an appeal or attempted to invoke the administrative procedures outlined in the denial letter.

Administrative exhaustion under ERISA is a judicially-created affirmative defense, which has been adopted by the United States Court of Appeals for the Third Circuit. *Metropolitan Life Ins. Co. v. Price*, 501 F.3d 271, 280 (3d Cir. 2007) ("The exhaustion requirement [under ERISA] is a nonjurisdictional affirmative defense."). Under prevailing Third Circuit precedent, a plaintiff cannot seek relief in the federal courts for an ERISA claim unless he or she has first exhausted available administrative remedies under the particular ERISA plan. *See D'Amico v. CBS Corp.*, 297 F.3d 287, 291 (3d Cir. 2002); *see also Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 249 (3d Cir. 2002); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990).[13] "Courts require exhaustion of administrative remedies 'to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned.'" *Harrow*, 279 F.3d at 249 (citing *Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir. 1980)).

"Although the exhaustion requirement is strictly enforced, courts have recognized an exception when resort to the administrative process would be futile." *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 916 (3d Cir. 1990); *see also Harrow*, 279 F.3d at 249 (stating that "[a] plaintiff is excused from exhausting administrative procedures under ERISA if it would be futile

---

[13]     The Court of Appeals has "dr[awn] a distinction between claims to enforce the terms of a benefit plan and claims to assert rights established by the ERISA statute" such that "[e]xhaustion of Plan remedies is required in the former, but not the latter, category of cases." *D'Amico*, 297 F.3d at 291. (citing *Zipf v. American Tel. and Tel. Co.*, 799 F.2d 889, 891 (3d Cir. 1986)). Here, Plaintiff only seeks to enforce the terms of the Policy and the receipt of benefits she contends are due to her; thus, administrative exhaustion is potentially a viable affirmative defense.

to do so."). In order for the futility exception to apply, there must be a "clear and positive

showing of futility." *Harrow*, 279 F.3d at 249 (quoting *Brown v. Cont'l Baking Co.*, 891 F.

Supp. 238, 241 (E.D. Pa.1995)).

Here, the denial letter issued by Defendants set forth specific procedures for Plaintiff to

follow in the event that she contested the denial of residual disability benefits in this case.

Among other things, the denial letter specifically advised her that:

> **If you do not have additional information, disagree with our**
> **determination, and want to appeal this claim decision, you**
> **must submit a written appeal. This appeal must be received by**
> **us within 180 days of the date you receive this letter even if you**
> **submitted additional information to my attention for**
> **reconsideration.**
>
> …
>
> A decision on appeal will be made not later than 45 days after we
> receive your written request for review of the initial determination.
> If we determine that special circumstances require an extension of
> time for a decision on appeal, the review period may be extended
> by an additional 45 days (90 days in total). We will notify you in
> writing if an additional 45 day extension is needed.
>
> …
>
> **If you dispute this determination, you have the right to bring a**
> **civil action under section 502(a) of the Employee Retirement**
> **Income Security Act following an adverse benefit**
> **determination on review. Unless there are special**
> **circumstances, this administrative appeal process must be**
> **completed before you begin any legal action regarding your**
> **claim.**

(Docket No. 5-8 at 2-6). The 180 day appeal period afforded to Plaintiff in this denial letter is

consistent with the applicable Department of Labor regulations, which state that a disability

insurance plan must "[p]rovide claimants at least 180 days following receipt of a notification of

an adverse benefit determination within which to appeal the determination." 29 C.F.R. §

2560.503-1(h)(3)(i), (h)(4) (2011).

Despite the fact that Plaintiff was apprised of the administrative appeal procedures in the June 4, 2010 denial letter, she has made no effort to avail herself to those procedures prior to filing this suit. (Docket No. 5-8 at 2-6).  The language of the quoted passages is clear that prior to filing a suit, Plaintiff was required to file an appeal within 180 days and then await a decision on her appeal.  (*Id.*).  Instead of following these procedures, Plaintiff filed the instant lawsuit on March 2, 2011, which is well outside the initial 180 day period she was afforded to appeal the decision. (Docket No. 1).  In addition, the denial letter invited Plaintiff to invoke her rights to an administrative appeal, clearly indicating that resorting to those administrative remedies would not have been futile and potentially making applicable the exception to the strictly enforced exhaustion rule.  *See Berger*, 911 F.2d at 916.

At this stage, Plaintiff has been given multiple opportunities to provide the Court with evidence on the issue of exhaustion of her administrative remedies.  However, she has not submitted any such evidence in conjunction with her initial brief in opposition as well as her sur-reply brief and she did not file any additional materials in response to the Court's Rule 12(d) Order converting the present motion to a motion for summary judgment.  (*See* Docket Nos. 11, 15).

In this Court's opinion, given the lack of evidence that Plaintiff pursued an appeal of the denial of her claim in any fashion, Plaintiff has failed to exhaust those administrative remedies as required under the Policy and outlined in the denial letter; therefore, to the extent that her Complaint is construed as raising claims under ERISA, said claims must be dismissed, with prejudice. [14]  *See D'Amico*, 297 F.3d at 291.  Likewise, the Court will not grant Plaintiff leave to

---

[14]     As the Court of Appeals recognized in *D'Amico*, this is not "in any way a ruling on the merits. It is, instead, limited to resolving the threshold question of whether administrative remedies must be exhausted before plaintiff[ ] may bring [her] claim[ ] in federal court."  *D'Amico*, 297 F.3d at 294.  Further, such an order does "not preclude later litigation on the merits of properly exhausted claims."  *Id.*

amend her Complaint at this time because as she has failed to timely exhaust her administrative remedies, any such amendment would be futile.  *See Phillips v. County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008) ("if a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile.").

VI.    CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment [5] is GRANTED. Summary judgment is entered in favor of Defendants and Plaintiff's claims are dismissed, with prejudice.  An appropriate Order follows.


*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

Date:   August 19, 2011

cc/ecf:  All counsel of record

28